# UNITED STATES DISTRICT COURT
## CENTRAL DISTRICT OF ILLINOIS
### PEORIA DIVISION

|  |  |  |
|---|---|---|
| SERVICE EMPLOYEES | ) | |
| INTERNATIONAL UNION LOCAL 73, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | Case No.  2:22-cv-02099 |
| v. | ) | |
| | ) | |
| BOARD OF TRUSTEES OF THE | ) | |
| UNIVERSITY OF ILLINOIS, | ) | |
| | ) | |
| Defendant. | ) | |

## ORDER & OPINION

This matter is before the Court on Defendant's Motion to Dismiss for failure to state a claim upon which relief may be granted and, as to Count II alone, lack of subject-matter jurisdiction. (Doc. 11). The Motion is fully briefed and ripe for review. For the following reasons, Defendant's Motion is denied as to Count I and granted as to Count II.

### BACKGROUND

Plaintiff is a labor union that serves as the exclusive representative of workers at the University of Illinois Urbana-Champaign (hereinafter "University") in certain job classifications, including culinary, food service, building services, laundry, and sanitation. (Doc. 1 at 1). On March 13, 2022, three of its members who also sat on its bargaining committee sought permission to speak during the public-comment period of an upcoming meeting of the Board of Trustees of the University ("Board"), Defendant in this action. (Doc. 1 at 4). All three submitted their requests in writing

to the Board Secretary in a timely manner as required by Defendant's Procedures Governing Appearances Before the Board of Trustees ("Procedures"). (Doc. 1 at 9). Dena Gary, president of Chapter 119 of Plaintiff Union, disclosed her union affiliation and position and stated that she wished to speak "about our treatment and unfair negotiations here at UIUC." (Doc. 1 at 4, 12). Michael Lindley, a steward and trustee of Chapter 119, identified himself as an employee working in Housing and requested "the opportunity to speak at the meeting to discuss the state of labor relations at the university." (Doc. 1 at 4, 14). Kelsey Hayes, who did not include an affiliation in her email to the Board Secretary, asked "to discuss the concerns of building service workers at UIUC." (Doc. 1 at 11). The next day, each would-be speaker received the same response from the Board Secretary: "I am writing in regards to your request to speak at the upcoming board of trustees meeting. Because of your proposed topic deals [*sic*] with issues under negotiation as part of the University's collective bargaining process, I am unable to approve your request." (Doc. 1 at 11–13). This explanation echoed Defendant's Procedures governing public comment at meetings, which reads in pertinent part: "[T]he Board will not hear presentations or entertain questions on . . . issues under negotiation as part of the University's collective bargaining process." (Doc. 1 at 9).

Plaintiff, both on its own behalf and via associational standing, filed suit against the Board under 42 U.S.C. § 1983, seeking injunctive and declaratory relief for alleged violations of its constitutional rights. It claims that both the denial of its members' requests to speak at the March 17, 2022, meeting and the above-quoted

2

section of the Procedures infringe on Plaintiff's right to free speech under the First Amendment as applied to the states under the Fourteenth Amendment. (Doc. 1 at 1). It asks this Court to issue a judgment declaring both to be unconstitutional, declaring that the public has a right to speak at open Board meetings about subjects of collective bargaining, and enjoining Defendant from enforcing the provision of its Procedures barring discussion on this topic during public-comment periods. (Doc. 1 at 5–6).

In its Complaint, Plaintiff also claimed Defendant's Procedures and conduct constituted violations of Illinois's Open Meetings Act, which provides, "Any person shall be permitted an opportunity to address public officials under the rules established and recorded by the public body." 5 ILCS 120/2.06(g). However, in its Response to Defendant's Motion, Plaintiff, "[u]pon consideration of certain of the authorities presented by Defendant," moved the Court to allow it to voluntarily dismiss the Open Meetings Act count without prejudice. (Doc. 15 at 1).

## LEGAL STANDARD

To survive a motion to dismiss for failure to state a claim under Federal Rule of Civil Procedure 12(b)(6), the complaint must contain "a short and plain statement" of the plaintiff's claim sufficient to plausibly demonstrate entitlement to relief. Fed. R. Civ. P. 8(a); *see also Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555–57 (2007). "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (citing *Twombly,* 550 U.S. at 556).

3

When considering a motion to dismiss, the Court construes the complaint in the light most favorable to the plaintiff, accepting all well-pleaded factual allegations as true and drawing "all reasonable inferences from those facts in favor of the plaintiff." *United States ex rel. Berkowitz v. Automation Aids, Inc.*, 896 F.3d 834, 839 (7th Cir. 2018). Those statements which are legal conclusions rather than factual allegations are not taken as true but are disregarded at this stage. *McReynolds v. Merrill Lynch & Co., Inc.*, 694 F.3d 873, 885 (7th Cir. 2012).

## DISCUSSION

### I.   Count I: First Amendment (Freedom of Speech)

The First Amendment protects against federal actions "abridging the freedom of speech," U.S. Const. amend. I; the Fourteenth Amendment's Due Process Clause prohibits state-government conduct with the same effect. *Fiske v. Kansas*, 274 U.S. 380 (1927). Plaintiff claims the rules Defendant (a public university board created by state statute, 110 ILCS 305/11) has adopted to govern board-meeting participation violate the First Amendment's free-speech guarantee on their face inasmuch as they bar members of the public from speaking about "issues under negotiation as part of the University's collective bargaining process." (Doc. 1 at 5). It further claims Defendant's decision to deny the requests of three individuals who are members of Plaintiff Union to speak at a Board meeting was unconstitutional—in other words, "[t]he Board's application of content-based restrictions to bar the speech of Plaintiff's members . . . violated the First Amendment." (Doc. 1 at 1).

This amounts to a two-prong challenge to the constitutionality of Defendant's policy: both facial and as-applied. It must be noted, however, that as developed in the

Complaint and the briefing of the Motion to Dismiss, the legal theory behind the two challenges is the same. Nowhere does Plaintiff contend that the Procedures were enforced inconsistently. For example, Plaintiff does not claim that members of the public who were not Union members or who took a different position on labor issues from Gary, Lindley, and Hayes were allowed to speak about these subjects at meetings. Nor does it state that Defendant singled out comments on labor matters for selective enforcement, permitting speech on other topics barred by the Procedures. Neither does Plaintiff argue that Defendant interpreted its own rules incorrectly or overbroadly; for instance, it does not draw a distinction between Gary's request to discuss "unfair negotiations" and Lindley's less specific topic proposal, "the state of labor relations at the university." (Doc. 1 at 12, 14). The briefing is devoid of allegations as to what constitutes an issue under negotiation and how Defendant determines that a given applicant's proposed topic is such an issue. Notwithstanding this lack of clarity, Plaintiff does not assert the challenged provision is void for vagueness.

The issue before the Court is thus a narrow one: whether a state university board's official policy of denying permission for members of the public to address the board at its open meetings on topics related to the collective bargaining process at the university, while allowing public comment on a variety of other subjects related to campus operations, violates the First Amendment.

A.  *Type of Forum*

Both parties recognize that a key question of law in this case is what type of speech forum the public-comment period at Defendant's meetings represents. When

5

government seeks to curtail speech within a forum it controls (e.g., public lands, government buildings, public schools, or meetings held by a government body), the Supreme Court has held the characteristics of that forum determine the standard a restraint on speech within it must meet in order to pass constitutional muster.

The history of forum analysis is convoluted, but the modern Supreme Court generally recognizes four types: the traditional public forum (streets, sidewalks, parks, and other public properties assumed open for speech at all times), the designated public forum, the limited public forum, and the nonpublic forum (often a facility that is not designed for public speech and where the government is essentially a landlord or proprietor).[1] *See, e.g.*, *Walker v. Texas Div., Sons of Confederate Veterans*, 576 U.S. 200, 215–16 (2015); *Int'l Soc'y for Krishna Consciousness v. Lee*, 505 U.S. 672, 678–79 (1992); *Lehmen v. City of Shaker Heights*, 418 U.S. 298, 304 (1974). The debate between the parties here is whether the public-comment period at Defendant's meetings is of the second or third type.

Plaintiff contends it is a designated public forum—a forum held open for speech during certain times on the same terms as traditional public forums. (Doc. 1 at 5). If this is correct, a strict-scrutiny standard applies: "As long as the government keeps the designated forum open for speech, it is bound by the same standards as apply in a traditional public forum. Reasonable time, place and manner regulations are

---

[1] The list of forum types continues to be fluid; in *Christian Legal Soc'y Chapter of the Univ. of California, Hastings Coll. of the Law v. Martinez*, 561 U.S. 661, 679 n. 11 (2010), the majority identified the kinds of free-speech forums as traditional, designated, and limited, with limited public forums apparently encompassing what the Court described as nonpublic forums in, for example, *International Society for Krishna Consciousness*.

permissible, and a content-based prohibition must be narrowly-drawn to effectuate a compelling state interest." *Perry Educ. Ass'n v. Perry Local Educators' Ass'n*, 460 U.S. 37, 46 (1983). Defendant, on the other hand, characterizes it as a limited public forum—one open for speech on a more selective basis for a discrete purpose. In a limited public forum, "the State is not required to and does not allow persons to engage in every type of speech. The State may be justified 'in reserving [its forum] for certain groups or for the discussion of certain topics.'" *Good News Club v. Milford Central Sch.*, 533 U.S. 98, 106 (2001) (quoting *Rosenberger v. Rector and Visitors of Univ. of Va.*, 515 U.S. 819, 829 (1995)). Viewpoint discrimination is still forbidden, but viewpoint-neutral restrictions are acceptable as long as they are "reasonable in light of the purpose served by the forum." *Id.* (quoting *Cornelius v. NAACP Legal Defense and Educ. Fund, Inc.*, 473 U.S. 788, 806 (1985)).[2] Plaintiff's allegation that Defendant's public-comment periods are designated public forums is a conclusion of law, and so the Court does not assume its truth for the purpose of evaluating the Motion to Dismiss. Rather, it is necessary for the Court to determine, in light of Plaintiff's factual allegations, the type of forum and the corresponding standard Plaintiff must meet to state a claim that its First Amendment rights were violated.

---

[2] The portion of the Court's opinion in *Cornelius* that is quoted in *Good News Club* pertains to a forum it identified as "nonpublic," not limited. However, the Court has differentiated in more recent cases between two types of forums it previously called nonpublic: limited public fora, and properties or platforms that are not speech forums at all and incur no special protection under the First Amendment. *See Barrett v. Walker Cty. Sch. Dist.*, 872 F.3d 1209, 1224 (11th Cir. 2017). The Court imported the standard of scrutiny applied to the nonpublic forum in *Cornelius* into its later discussions of limited public fora. *See, e.g.*, *Rosenberger*, 515 U.S. at 829.

The starting point in applying forum analysis to the case at hand is that there is no federal constitutional right to be heard whenever a public body meets or deliberates. *Minn. State Bd. for Cmty. Colls. v. Knight*, 465 U.S. 271, 283 (1984). Public bodies may hold closed meetings, restrict public comment to items on the agenda, or forego public input at their meetings altogether without running afoul of the Constitution or federal law (although state law, as it does in Illinois, may impose additional requirements). The question here is, when a government body *does* open its meetings to some degree of public participation, what sort of forum has it created, and to what extent is it obliged to grant a platform to all speakers and speech?

Neither the Supreme Court nor the Seventh Circuit Court of Appeals has assigned a single forum label to all public-comment periods taking place during government bodies' meetings. *See, e.g.*, *Knight*, 465 U.S. at 282 (citing to cases the Court interpreted as calling public school board meetings open forums for speech but holding that a private "meet and confer" session between an educational employer and employees was not a free-speech forum at all); *City of Madison, Joint Sch. Dist. No. 8 v. Wisconsin Emp't. Rels. Comm'n*, 429 U.S. 167 (1976) (hereinafter "*City of Madison*") (finding, as discussed *infra*, that a school board could not prevent a class of persons from speaking at its meetings but not establishing what type of forum the meeting was); *Surita v. Hyde*, 665 F.3d 860, 869 (7th Cir. 2001) (finding a city council meeting a designated public forum where it allowed anyone to speak for three minutes on any topic without prior clearance); *Ayres v. City of Chicago*, 966 F. Supp. 701 (N.D. Ill.) (aff'd, 125 F.3d 1010 (7th Cir. 1997)) (calling a school board meeting a

limited public forum *en route* to applying strict scrutiny to an anti-peddling ordinance constraining speech in the traditional public forum of city sidewalks).

Other circuits have also reached a variety of conclusions. *See, e.g.*, *Barrett v. Walker Cty. Sch. Dist.*, 872 F.3d 1209, 1224 (11th Cir. 2017) (finding the public-comment period of a school board meeting a limited public forum when it is not "open to the public at large for discussion of any and all topics"); *Mesa v. White*, 197 F.3d 1041 (10th Cir. 1999) (proceeding on the assumption that, as agreed by both parties, the county commission meeting's public-comment period was a designated public forum but applying an intermediate-scrutiny standard); *White v. City of Norwalk*, 900 F.2d 1421, 1425 (9th Cir. 1990) ("[S]uch meetings, once opened, have been regarded as public forums, albeit limited ones."); *Jones v. Heyman*, 888 F.2d 1328, 1331 (11th Cir. 1989) (assuming city commission meeting was a designated public forum "when the commission intentionally opened it to the public and permitted public discourse on agenda items" but acknowledging it applied the strict-scrutiny standard because the parties agreed it was the correct one); *Musso v. Hourigan*, 836 F.2d 736, 742 (2nd Cir. 1988) (finding strict scrutiny the rule "in a place where public speech is usually allowed, such as an open school board meeting"); *Hickory Fire Fighters Ass'n, Local 2653 of Int'l Ass'n of Fire Fighters v. City of Hickory*, 656 F.2d 917, 920 (4th Cir. 1981) (stating that city council meetings are "dedicated as public forums").

This range of examples may reflect a circuit split but also the fact that not all public-body meetings are operated alike, with identical provisions for public participation. Plaintiff is thus correct that Defendant overreaches in claiming a

9

university board meeting is *inherently* a limited public forum. (Doc. 15 at 19). This does not, however, mean Plaintiff's claim should survive a motion to dismiss on that basis. The forum inquiry is fact-specific, but given the narrowness of Plaintiff's claim, all factual allegations needed to resolve that inquiry are now before the Court. As Defendant states in its Reply, "Plaintiff does not point to a single 'fact-specific' question that warrants discovery into forum analysis, and none exists: the Complaint itself attaches the Board's Procedures, which make the forum analysis here straightforward under governing law." (Doc. 16 at 5–6).

Therefore, the Court now proceeds to examine the Procedures to ascertain the characteristics of the forum in the instant case, the rules governing public participation in that forum, and the particular restriction at issue.

Members of the public are not allowed to speak at Board meetings without prior permission. (Doc. 1 at 9). The Procedures establish a system for obtaining permission to speak at a Board meeting by writing to the Board Secretary at least three days in advance of the meeting and identifying the name, affiliation, and proposed topic of the would-be speaker. (Doc. 1 at 9). No ad hoc or substitute speakers are allowed the floor. (Doc. 1 at 9). A limited period of time is set aside for public comment; a maximum of six speakers may present comments and questions at each meeting. (Doc. 1 at 9).

Members of the public who are permitted in advance to speak at a meeting may make comments and/or ask questions, but Board members do not obligate themselves to answer every question asked. (Doc. 1 at 9). Comments and questions

"must relate to matters within the jurisdiction of the Board of Trustees," though public comment is not necessarily limited to items on that meeting's agenda. (Doc. 1 at 9). However, this provision would exclude discussion of any topic unrelated to the University (e.g., the upkeep of Interstate 57, national banking policy, or the speaker's latest artwork) but also University-related topics outside the Board's power to address (an exhortation for college students to devote themselves to religious piety, for example). Additionally, certain topics are off-limits even if within the Board's jurisdiction—not only issues under collective bargaining, but also "statements concerning the private activities, lifestyles or beliefs of individuals," "grievances of individual students or employees," "proposals or bids for contracts," and "litigation involving the University." (Doc. 1 at 9). Finally, other limitations apply when more than six people have applied for permission to speak at a single meeting. In that event, Defendant will grant permission in the order otherwise-eligible requests were received, with priority given to those received earliest. (Doc. 1 at 9). Its Procedures also prioritize "subject matters that relate to the agenda" and decisions that serve "to avoid repetitiveness," presumably by declining requests to speak on the same topic as an earlier requestor has sought to address. (Doc. 1 at 9).

Thus, Defendant has created a forum in which speakers must obtain advance permission and adhere to limitations on speaking time, as well as a timeline for and prescribed means of applying to speak at a meeting. It also sets parameters that open the public-comment period to all classes of speakers but not all topics of speech. This is a key difference between the instant case and *City of Madison*, upon which Plaintiff

11

relies heavily for its contention that Defendant's Procedures are subject to strict scrutiny. While that opinion is an important source of speech-forum jurisprudence, its facts depart significantly from those before this Court, and it predates the current rubric of free-speech forum types and thus is of limited utility in helping to identify which kind of forum the board meeting in *City of Madison* was and which kind of forum Defendant has created.

*City of Madison* challenged the Wisconsin Employment Relations Commission's ruling under a state law prohibiting school boards from negotiating directly with teachers other than the union's exclusive collective-bargaining representative. 429 U.S. at 172. The plaintiff school board had allowed a teacher whose views were inconsistent with the union's position to give remarks at an open board meeting, and the Commission had found the board in violation of the law against direct dealing. *Id.* at 173. In reviewing this decision, the Court opined that "[w]hatever its duties . . . when the board sits in public meetings to conduct public business and hear the views of citizens, it may not be required to discriminate between speakers on the basis of their employment, or the content of their speech." *Id.* at 176. It held the Commission could not prohibit school boards from hearing public comment given by non-union-representative teachers. *Id.*

While the facts appear similar on their face—encompassing unions, educational boards, and public-comment segments at board meetings—the question posed there was quite different from the one here. The Commission's application of state law in *City of Madison* discriminated between classes of speakers (bargaining

representatives and non-teachers, versus teachers who were not bargaining representatives) rather than between classes of speech (labor-related versus other topics) as in this case. The Court recognized the former distinction as neither content- nor viewpoint-neutral, since a union's bargaining representative can be counted upon to voice a certain stance on subjects of negotiation (a position likely already known to the school board before the meeting), whereas a teacher who does not speak on behalf of the union is more likely to advance a perspective at odds with that of the union. *Id.* at 175–76. As a result, the Court did not need to reach the question of whether a viewpoint-neutral restriction on the general subject matter of comments to the board would have been constitutional.

Moreover, at no point in the majority's opinion did the Court categorize the school board meeting as a particular type of forum, nor explicitly identify the tier of scrutiny it used to decide Wisconsin's restraint on speech was improper. The Court's attention to the Commission's distinction between speakers on the basis of their employment and roles within the union suggests the conclusion that when the majority, in *dicta*, referred to discrimination based on the "content" of speech, it referred more to viewpoint (the content of what a particular speaker is saying) than to general subject matter (labor relations as opposed to other topics). At the very least, it seems a majority of justices did not agree on broader implications for speech at government meetings. Justice Stewart emphasized that "we are not called upon in this case to consider what constitutional limitations there may be upon a governmental body's authority to structure discussion at public meetings." *Id.* at 177

(Stewart, J., concurring). Justice Brennan, by contrast, joined by Justice Marshall, cited *Police Dept. of Chicago v. Mosley*, 408 U.S. 92, 96 (1972), a case concerning a traditional public forum triggering strict scrutiny, stating that when a government body "open[s] its decisionmaking processes to public view and participation . . . [it] has created a public forum dedicated to the expression of views by the general public." *Id.* at 178–79 (Brennan, J., concurring). More recently, however, courts considering the legacy of *City of Madison* have often found it treated the meeting as a limited public forum. *See, e.g.*, *Ayres*, 966 F. Supp. at 711–12; *White*, 900 F.2d at 1425.

Forum analysis depends upon the parameters set for each particular forum. Certainly, the circularity of determining the constitutionality of a forum's restraint on speech using the forum's own preexisting rules is perplexing. As the Seventh Circuit Court of Appeals put the conundrum in *DeBoer v. Village of Oak Park*, "[T]he more selective the government is in restricting access to its property, the more likely that the property will be considered a nonpublic forum"—and thus the more likely a court may be to find those restrictions acceptable. 267 F.3d 558, 566 (7th Cir. 2001).

The answer may lie in the consistency and even-handedness of enforcement and when restrictions are applied. In *Christian Legal Soc'y v. Walker*, the Seventh Circuit examined the case of a faith-based student group faced with losing its status as a registered campus organization because it excluded students who approved of or participated in same-sex relationships. 453 F.3d 853, 858 (7th Cir. 2006). It allowed the case to go forward, and while it found it did not yet have enough facts to define the nature of the speech forum, it noted particular concern over the plaintiff's

14

allegations that the university had allowed other groups to discriminate on prohibited bases (e.g., a Muslim group to admit only Muslims) without suffering the same consequences as the plaintiff organization. *Id.* at 866. The court observed, "Once the government has set the boundaries of its forum, it may not renege; it must respect its own self-imposed boundaries." *Id.*

Likewise, the Supreme Court found the "meet and confer" sessions held by the Minnesota State Board for Community Colleges to be nonpublic forums in part because they had been consistently and traditionally closed to the general public; the majority contrasted this with more constitutionally suspect situations where "[t]he First Amendment was violated when the meetings were suddenly closed to one segment of the public even though they remained open for participation by the public at large." 465 U.S. at 281.

Even in a designated public forum, the government may, at the outset, restrict the forum's purpose and the class of speakers for whom it is designed. *See Arkansas Educ. Television Comm'n v. Forbes*, 523 U.S. 666 (1998). The Supreme Court has defined a designated public forum as one created "for use by the public at large for assembly and speech, for use by *certain speakers*, or for the discussion *of certain subjects.*" *Cornelius*, 473 U.S. at 802 (emphasis added). Thus, it may be permissible to set certain (viewpoint-neutral) parameters for a designated public forum, but once those boundaries are fixed, no further discrimination between speakers, viewpoints, or topics may occur unless it is narrowly tailored to advance a compelling government interest. *Forbes*, 523 U.S. at 677 ("If the government excludes a speaker who falls

15

within the class to which a designated public forum is made generally available, its action is subject to strict scrutiny."). When a government body creates a limited public forum, "the state is not required to and does not allow persons to engage in every type of speech." *Good News Club*, 533 U.S. at 106. Yet in the setting of a limited public forum, even subsequent restrictions may be permitted as long as they are viewpoint-neutral and reasonable. *Id.*

The difference is sometimes a matter of timing and elsewhere a matter of degree. *See Barrett*, 872 F.3d at 1224 ("[A] designated public forum grants 'general access' to the designated class, while a limited public forum can be set up to grant only 'selective access to that class.'" (quoting *Forbes*, 523 U.S. at 679–80)). The Court observes, then, that the distance between a designated and a limited public forum may not be as vast as the parties here imagine. Even if defined as designated, the public's opportunity to speak at Board meetings was established under certain parameters, which could be interpreted as including the Procedures' restrictions on speaker topics. Plaintiff does not allege that the provision it challenges is of recent vintage, surprised its members, or represented a new narrowing of the scope of a forum that had previously been more open. If that is the case, then the rule at issue may simply be part of the original architecture of the designated forum, not a bid to discriminate against types of speech previously admitted.

Ultimately, however, Board meetings bear greater resemblance to forums identified as limited than to those courts have found to be designated. One recurring feature of limited public forums is the existence of a system through which speakers

must obtain advance permission. *Contrast Barrett*, 872 F.3d at 1224–25 (limited public forum where members of the public must first obtain permission to address the board) *with Surita*, 665 F.3d at 869 (designated public forum open to anyone to speak for three minutes on any topic). Defendant here requires speakers to obtain clearance from the Board Secretary before addressing a meeting. The challenged provision is a restriction within a restriction; members of the public are welcome to speak only on subjects within Defendant's jurisdiction, and there are also subsets of that broader topic that are off-limits (e.g., litigation, grievances, and labor relations).

This type of heavily regulated forum has little in common with town-hall meetings, open-microphone events, and other fora where limitations are few and the general public might reasonably conclude that it is welcome to participate in freewheeling, inclusive speech—thus making later decisions to exclude individual speakers potentially more problematic. *See, e.g., Surita*, 665 F.3d at 870 (holding city council meeting where anyone could speak on any topic without prior permission was a designated public forum, and plaintiff's rights were violated when he was required to apologize to a city official before speaking, in part because this condition was based on defendant's prior knowledge of plaintiff's identity, conduct, and opinions). It has more in common with forums embracing a limited objective—a "governmental process with a governmental purpose," as the Ninth Circuit Court of Appeals described the public board meeting in *White*, 900 F.2d at 1425.

Thus, the Court will apply the more lenient standard of the limited public forum: restrictions on speech must be viewpoint-neutral and reasonable in light of the forum's purpose.

B.     *The Limited Public Forum Standard*

Having identified the forum as a limited one, the Court now applies the criteria of viewpoint neutrality and reasonableness to determine if Plaintiff plausibly states a claim upon which relief may be granted for a violation of its speech rights in such a forum.

Plaintiff and Defendant agree that the applicable provision of the Procedures does not discriminate on the basis of a speaker's viewpoint. (Doc. 12 at 12). In other words, neither a Union member or ally, nor a person who takes the position of management, may address the Board of Trustees on the topic of labor negotiations. The sole remaining question is whether the restriction is reasonable.

As Defendant points out, a requirement that something be reasonable is generally a low bar in the law. (Doc. 12 at 18). Courts have found restrictions on speech in limited public forums reasonable when they advance goals such as civility, decorum, relevance, and fairness to other speakers participating in the forum. *Stevens v. Town of Snow Hill*, No. 4:19-CV-156-D, 2021 WL 2345353, at *4 (June 8, 2021) (surveying cases addressing reasonableness in speech restrictions at public meetings). However, reasonableness must be real and substantial, not mere boilerplate. Plaintiff in this case hardly concedes (as Defendant says it does (doc. 16 at 6)) that Defendant's restraint on speech is reasonable. Instead, it explicitly alleges

18

the restriction is unreasonable (doc. 1 at 5), and Defendant ultimately is unable to construe the facts of the Complaint as stating no such claim (doc. 15 at 11).

Defendant bases its argument for reasonableness primarily on the risk it will be found in violation of state labor laws if members of the public discuss subjects of collective bargaining at its meetings. (Doc. 12 at 19). Plaintiff asserts this fear does not logically support a blanket policy of forbidding all would-be speakers from discussing any topic that could conceivably become a subject of the bargaining process. (Doc. 15 at 11).[3] After all, "there is virtually no subject concerning the operation of the school system [here, university] that could not also be characterized as a potential subject of collective bargaining." *City of Madison*, 429 U.S. at 176–77. In addition to finding the prohibition on labor-related speech overbroad, the Supreme Court in *City of Madison* observed that a teacher's unilateral advocacy for a position distinct from the union's in remarks at a public meeting was not tantamount to "negotiation." *Id.* at 174. The Fourth Circuit Court of Appeals has likewise found that merely speaking about labor issues was not bargaining *per se*, and on that basis it concluded the desire to avoid unauthorized negotiations at its meetings was not a compelling interest justifying the city council in prohibiting fire fighters from addressing labor concerns. *Hickory Fire Fighters Ass'n, Local 2653 of Int'l Ass'n of Fire Fighters*, 656 F.2d at 921. That court was measuring the policy against a more

---

[3] The Procedures make no distinction between Board meetings held while collective bargaining between the University and the applicable union is occurring, and those held during times where there are no active labor negotiations. The Complaint does not definitively state whether collective bargaining was ongoing between the parties at the time when the requests to speak at the meeting were submitted.

demanding standard, but as it is not yet necessary for this Court to determine if Defendant's rule is reasonable—only whether Plaintiff has made out a plausible claim—its rationale is relevant. In both cases, as in this one, the government officials listening to the speech were under no obligation to respond to a particular commenter or questioner, let alone engage in back-and-forth negotiation. (Doc. 1 at 9).

This matters in the context of Illinois labor law, too. In affirming a decision of the Illinois Educational Labor Relations Board that a school board violated state law when it bypassed the exclusive bargaining representative to grant special benefits to particular employees, the Fourth District Appellate Court of Illinois addressed the board's contention that it was not negotiating, but merely listening to the employees' proposals (and later accepting them without further discussion). *Bd. of Educ. of Sesser-Valier Comm. Unit Sch. Dist. No. 196 v. Ill. Educ. Labor Rels. Bd.*, 250 Ill. App. 3d 878 (4th Dist. 1993). That court noted the "District argues that no authority holds that an employer cannot listen to employees without the exclusive representative being present," then concluded "that the District here did more than merely listen to the individual employees; it also acted on their requests." *Id.* at 883–84. Although Defendant uses this ruling to warn of the fate that could befall the Board of Trustees if it were to hear public comments on labor matters, the court shed no doubt on the principle that "merely listening" to employees is not bargaining. It based its judgment not on what the board heard, but on what it did afterwards. Inasmuch as Defendant is worried about labor-law liability, *Sesser-Valier* suggests the Board

alone holds the power not to engage in prohibited direct dealing. It has not shown thus far that public comments, absent more, will lead it into transgression.

Defendant also misreads *Sherrard Community School District No. 200 v. Illinois Educational Labor Relations Board*, another purported illustration of the dangers of allowing union members to speak directly to the Board during public meetings. 296 Ill. App. 3d 1002 (4th Dist. 1998). That case involved a teacher who obtained permission to speak to the school board in a closed session, outside the presence of union representatives, whereupon she sought and was granted an advantageous placement for herself. *Id.* at 1007. Outcomes such as this one obviously strike at the heart of the collective-bargaining premise and will often run afoul of state law, as the state court found in *Sherrard*. *Id.* (holding the school board had violated the Illinois Educational Labor Relations Act, 115 ILCS 5/1 *et seq.*, even though what took place in the closed session could not be described as a typical negotiation, because "back-and-forth negotiations are not required" for unauthorized bargaining to have occurred).

But here, Plaintiff's members did not ask to speak privately with the trustees. Instead, they wished to make a presentation to the Board in an open session, in the presence of other members of the public and presumably some of their Union brethren, quite possibly streamed online to countless others outside the room. Any

21

labor-law violations would have been immediately apparent. There was little to no danger unauthorized agreements would be formed.[4]

Nor does the provision of the Illinois Open Meetings Act allowing public bodies to discuss subjects of collective bargaining in closed session assist Defendant in obtaining dismissal of the free-speech count. The OMA permits public bodies to pull the curtain over "collective negotiating matters," 5 ILCS 120/2; it does not require them to do so. Furthermore, it applies to the members' discussions amongst themselves, not speech by members of the public.

Finally, Defendant raises the fact that it offers alternative means by which the public may communicate with the Board to express views on topics prohibited during meetings. (Doc. 12 at 20). The ability of Plaintiff's members to send emails or letters to the Board is irrelevant here, because its claim is that Defendant has infringed upon its right to speak—not its right to petition the government. Speaking at a public meeting, where one may rally the support of other community members and attract wider publicity for one's views, is qualitatively different from addressing written correspondence to a government body. Defendant's proffer of alternative means also undermines its argument that its restriction on labor-related speech at meetings is motivated by reasonable concerns about unlawful communications on the sidelines of

---

[4] The risk of liability for Defendant was likely even less because all three individuals who asked to speak at the March 17, 2022, meeting were members of the bargaining committee, differentiating this case from ones in which employees with no legal authority to speak for the union have sought audiences with governing bodies representing management. However, the parties' briefing offers no information as to who else would have needed to be present in order to hold a lawful collective-bargaining session, and besides, Plaintiff mounts a facial challenge to the rule, which bars any member of the public, not just a union representative, from speaking on the forbidden subjects.

collective bargaining. Surely a direct email from a single member of the bargaining unit, sent and perhaps responded to outside the view of some of the persons designated to speak within the bargaining process (not to mention the press and general public) raises a greater risk of problematic conduct than a verbal comment in an open meeting.

Facts may come to light during discovery that bolster Defendant's claim that its policy is reasonable in relation to the various legal and institutional obligations the Board must balance when it conducts its meetings. At this juncture, with the factual allegations of the Complaint taken as true, Plaintiff has stated a claim for relief on the basis that Defendant's prohibition on labor-related speech at its meetings (and enforcement of that rule against Plaintiff's members) is unreasonable and thus violates the First Amendment's protection of speech within a limited public forum.

## II. Count II: Open Meetings Act

Defendant moved to dismiss Count II, Plaintiff's claims under the Illinois Open Meetings Act, because under the Eleventh Amendment, this Court lacks jurisdiction to enter an injunction against a state based upon state law. *See Pennhurst State Sch. and Hosp. v. Halderman*, 465 U.S. 89, 117 (1984); *Sorrentino v. Godinez*, 777 F.3d 401, 415 (7th Cir. 2015). Having seen the writing on the wall in the form of clear legal precedent, Plaintiff sought voluntary dismissal without prejudice of Count II. (Doc. 15 at 1, n. 1). The Court dismisses the Open Meetings Act claim but finds it would be of no avail to allow Plaintiff to refile this claim, as Defendant has sovereign immunity to it. Count II is dismissed with prejudice.

## CONCLUSION

For the foregoing reasons, Defendant's Motion to Dismiss (doc. 11) is granted in part and denied in part. Count II of the Complaint is DISMISSED without leave to replead; this claim is terminated. Defendant's Motion to Dismiss is DENIED as to Count I, and Defendant's Answer to Count I is due on or before June 5, 2023.

SO ORDERED.

Entered this 22nd day of May 2023.

s/ Joe B. McDade
_____
JOE BILLY McDADE
United States Senior District Judge